IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 7, 2022 Session

**RODNEY TURNER v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 10-02394          Jennifer Johnson Mitchell, Judge
———————————————————

**No. W2021-00531-CCA-R3-PC**
———————————————————

The Petitioner, Rodney Turner, appeals the post-conviction court's denial of his post-conviction petition, in which he challenged his two convictions of attempted first degree murder and one conviction of employing a firearm during the commission of a dangerous felony and the resulting total effective sentence of fifty years. On appeal, the Petitioner contends that he received the ineffective assistance of counsel at trial and on direct appeal and that the post-conviction court erred by denying funds for a fingerprint expert. Upon reviewing the record, the parties' briefs, oral arguments, and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Rodney Turner.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

*Trial and Direct Appeal*

On direct appeal, this court summarized the facts adduced at trial as follows:

In the early morning hours of August 3, 2009, Officer Brian Falatko of the Memphis Police Department (MPD) responded to an "auto theft" call. When Officer Falatko stepped out of his patrol car, the victim, Terry Higgs, came running up to him. Officer Falatko testified that Mr. Higgs seemed "pretty upset" and said to Officer Falatko, "They're trying to rob me, they've taken my car." Officer Falatko recalled that Mr. Higgs "appeared as though he was trying to get away from someone." Mr. Higgs told Officer Falatko that the men were running along a nearby fence that separated two apartment complexes.

Officer Falatko testified that he and Mr. Higgs were walking towards the fence when he saw "four individuals" running along the fence. Almost immediately, one of the men shot at Officer Falatko and Mr. Higgs with "what appeared to be shotgun." Another man, the [Petitioner], began shooting at them with "what appeared to be a pistol." Officer Falatko testified that he knew it was a pistol because the [Petitioner] was "back lit extremely well" and he could see "the silver glean from the light." A third man then began shooting at them with another pistol.

Officer Falatko testified that Mr. Higgs "was struck by the shotgun blast" and that he pushed Mr. Higgs behind him to protect Mr. Higgs. According to Officer Falatko, he then saw the [Petitioner], who was wearing a "white shirt and blue jean shorts," stop and "square off" to fire at Officer Falatko and Mr. Higgs. Officer Falatko testified that he "could see the muzzle flashes coming from" the silver pistol. Officer Falatko pulled out his gun and shot at the [Petitioner] three times, hitting him on the third shot. The men with the shotgun and the other pistol took cover behind some nearby dumpsters and continued to shoot at Officer Falatko.

Officer Falatko testified that a fourth man in a red shirt tried to help the [Petitioner] over the fence but that the [Petitioner's] shirt got stuck on the fence, and he was left hanging there. The man in the red shirt abandoned the [Petitioner] when more police officers arrived to assist Officer Falatko. Officer Jack Henry of the MPD testified that he responded to Officer Falatko's call for backup. When Officer Henry arrived on the scene, he saw the [Petitioner] hanging from the fence and a man in a red shirt trying to help the [Petitioner] before running away.

Officer Henry found a "two-shot," silver derringer pistol on the ground near the [Petitioner's] feet. In addition to the derringer found by the [Petitioner's] feet, police officers also recovered spent shotgun casings near

the fence. In the neighboring apartment complex, witnesses saw a man wearing a red shirt and another man run into an apartment after the shooting. Police officers found Chris Burchette and a man known as "Strilla" inside the apartment. A search of the apartment revealed a red shirt with what appeared to be blood on it, a pistol, and a shotgun.

Later testing by the Tennessee Bureau of Investigation (TBI) determined that the derringer found at the [Petitioner's] feet had the [Petitioner's] blood and DNA on it. The derringer was in working order and had two spent casings in it, meaning that it had been fired. The [Petitioner's] blood and DNA were also found on the red shirt discovered in the apartment where Mr. Burchette and "Strilla" had run into after the shooting. The spent shell casings found by the fence matched the shotgun recovered from the apartment.

Mr. Higgs testified that he called the police because a man known as "G-Baby" had walked into his apartment and taken the keys to his car. According to Mr. Higgs, after he got off the phone with the police he went outside to see if he could find his car and he saw a man with a shotgun. Mr. Higgs testified that he ran back into his house and slammed the door. Mr. Higgs then saw "some more guys standing" outside his apartment. When Officer Falatko arrived, Mr. Higgs went outside to tell him about the men. Mr. Higgs testified that as he and Officer Falatko approached the men, the man with the shotgun fired at them and then "two more guys behind him fired with handguns." Mr. Higgs further testified that he only saw three men along the fence. Mr. Higgs was struck by buckshot from the shotgun and ran back to his apartment when Officer Falatko began shooting at the men.

Shaterrica Rufus testified that she lived in a nearby apartment complex and that she saw the [Petitioner] with "Strilla" and "G-Baby" the day before the shooting. Ms. Rufus further testified that she again saw the [Petitioner] with "Strilla" and "G-Baby" approximately ten minutes before the shooting and that the [Petitioner] was carrying a black "long gun." Ms. Rufus also testified that she saw Mr. Burchette wearing a red shirt and carrying a handgun before the shooting.

*State v. Rodney Turner*, No. W2012-01930-CCA-R3-CD, 2013 WL 6706092, at *1-2 (Tenn. Crim. App. Dec. 18, 2013), *perm. app. denied* (Tenn. May 23, 2014).

A jury convicted the Petitioner of two counts of attempted first degree murder, a Class A felony, and one count of employing a firearm during the commission of a

dangerous felony, a Class C felony. *Id.* at *1. The trial court imposed concurrent sentences of forty years for both counts of attempted first degree murder. *Id.* The trial court imposed a ten-year sentence for the employment of a firearm conviction and ordered six years of that sentence to be served at one hundred percent. *Id.* Finally, the trial court ordered the ten-year sentence to be served consecutively to the forty-year sentences for a total effective sentence of fifty years. *Id.*

At trial and the sentencing hearing, the Petitioner was represented by trial counsel. After the sentencing hearing, trial counsel withdrew from representation. New counsel was appointed, and an untimely motion for new trial was filed. After the trial court denied the motion, a direct appeal was filed, contending that the trial court erred by failing to require the State to produce a prior statement made by Officer Falatko to internal affairs because the statement could have contained "valuable impeachment material." *Id.* at *2. On direct appeal, this court noted that prior to trial, the Petitioner had requested the statement as *Jencks* material pursuant to Tennessee Rule of Criminal Procedure 26.2. *Id.* at *3; *see also State v. Rodney Turner*, No. W2016-01520-CCA-R3-CD, 2017 WL 3268543, at *4 (Tenn. Crim. App. June 6, 2017), *perm. app. denied* (Tenn. Nov. 22, 2017). However, the trial court ultimately agreed with the State that the statement was inadmissible pursuant to *Garrity v. New Jersey*, 385 U.S. 493 (1967), because Officer Falatko was required to give the statement or face termination. *Rodney Turner*, 2013 WL 6706092, at *3. This court held that the Petitioner's issue was waived because both his motion for new trial and his notice of appeal were untimely. *Id.* In examining the issue for plain error, this court observed that "[i]n *Garrity*, the United States Supreme Court held that 'statements obtained under threat of removal from office' by several police officers could not later be used to prosecute the officers because the statements had been coerced." *Id.* at *5. However, nothing in *Garrity* suggested that Officer Falatko's statement could not be produced under Tennessee Rule of Criminal Procedure 26.2 or that the trial court "could not require the statement [to be] produced for an in camera inspection or retained for appellate review" to determine whether the statement contained any possible impeachment material. *Id.* Regardless, this court held that because overwhelming evidence at trial corroborated Officer Falatko's testimony, plain error relief was not warranted. *Id.* Accordingly, this court affirmed the judgments of the trial court. *Id.*

*Delayed Motion for New Trial and Subsequent Appeal*

Thereafter, the Petitioner filed a petition for post-conviction relief. Appellate counsel was appointed, and an amended petition was filed. In the petitions, the Petitioner requested the opportunity to file a delayed motion for new trial. The trial court granted the petition but, after a hearing, denied the motion for new trial. *See Rodney Turner*, 2017 WL 3268543, at *1. The Petitioner appealed the trial court's ruling, contending that the trial court erred by failing to require the State to produce Officer Falatko's statement. *Id.* He

also argued that the statement was newly discovered evidence which warranted a new trial. *Id.* This court reaffirmed that the trial court erred when it concluded *Garrity* precluded the State from having to produce the statement. *Id.* at *4. Regardless, after examining the statement, this court agreed with the trial court's determination that there were "no substantial discrepancies between Officer Falatko's statement and his trial testimony." *Id.* This court further noted that any discrepancies identified by the Petitioner did not affect the proof adduced at trial showing that the Petitioner was armed with the pistol and shot at Officer Falatko. *Id.* Therefore, this court concluded that the error was harmless and denied relief. *Id.* This court further concluded that the Petitioner was not entitled to a new trial because of newly discovered evidence, noting that the statement was not so crucial to the Petitioner's guilt or innocence that a reasonable basis existed to conclude that had it been presented at trial, the result of the proceedings might have been different. *Id.* at *5. The Petitioner, acting pursuant to Tennessee Rule of Appellate Procedure 11, filed a pro se application for permission to appeal this court's decision to our supreme court. The application was denied on November 22, 2017.

*Post-Conviction Proceedings*

Subsequently, the Petitioner filed another pro se post-conviction petition. Post-conviction counsel was appointed, and an amended petition was filed. In the petitions, the Petitioner raised numerous allegations of ineffective assistance of trial counsel and appellate counsel.

At the post-conviction hearing, trial counsel testified that he was licensed to practice law in 1974. His practice had consisted of many areas, but for the last few years, he practiced mostly criminal defense work. In 2011, he was retained to represent the Petitioner in an attempted first degree murder trial. Trial counsel said that he did not have a "complete file" regarding the Petitioner's case.

Trial counsel agreed that although the Petitioner had twelve prior felonies, he committed "essentially two separate robberies." Trial counsel acknowledged that he did not research whether the convictions should merge for sentencing purposes "under the twenty-four hour merger rule" because he did not think the issue was significant. Trial counsel also said he did not consider arguing that the Petitioner's fifty-year sentence was cruel and unusual punishment.

Trial counsel acknowledged that he did not file a pretrial motion requesting a hearing pursuant to Tennessee Rule of Evidence 609, alternately referred to as a *Morgan* hearing. *See State v. Morgan*, 541 S.W.2d 285 (Tenn. 1976). The hearing would have determined which of the Petitioner's prior convictions could be used for impeachment purposes, especially when some of the prior convictions were similar to the charges for

which the Petitioner was on trial. Trial counsel did not recall his reason for not filing such a motion. Trial counsel agreed that many of the Petitioner's prior convictions were "robbery type convictions" and that in the facts of the case, "[t]here was a robbery involved." Trial counsel acknowledged that he did not research the body of law relating to *State v. Mixon*, 983 S.W.2d 661 (Tenn. 1999), which concerned whether the Petitioner could be impeached with a prior crime that was similar to the crime with which he was charged. Trial counsel said that he could not say whether he would have filed a Rule 609 motion if he had been aware of a potential *Mixon* issue. Trial counsel acknowledged that during the *Momon* hearing confirming that the Petitioner did not want to testify at trial, he told the Petitioner that he could be impeached with his prior convictions. *See Momon v. State*, 18 S.W.3d 152, 163 (Tenn. 1999).

Trial counsel said that he did not recall how many meetings he had with the Petitioner from the time he was retained in February 2011 until the trial. Trial counsel did not recall discussing with the Petitioner whether to testify at trial but was "sure" they talked about it on more than one occasion. Trial counsel told the Petitioner that only the Petitioner could decide whether he would testify and that if he testified, his prior record could be used against him. Trial counsel could not recall if the Petitioner expressed whether he wanted to testify. Trial counsel was "sure" the Petitioner told trial counsel his version of events, but trial counsel could not recall what the Petitioner said. Trial counsel said that as a "con" of testifying, he told the Petitioner that his prior record could be used against him. As a "pro" of testifying, trial counsel told his clients that even though the trial court would instruct the jury that the defendant did not have to testify, "most people don't care about that. They figure if you don't testify, you must be trying to hide something."

Trial counsel said he did not remember whether Mr. Higgs was "much more equivocal" at the preliminary hearing than at trial regarding whether he heard the pistols being fired following the shotgun. Trial counsel did not cross-examine Mr. Higgs regarding why he was more certain about hearing the pistols after the shotgun at trial because he either failed to see the significance of doing so or he "missed it."

Trial counsel said that he recalled a pistol was found at the scene next to the Petitioner and that blood was found at the scene. Trial counsel never considered hiring a fingerprint expert to verify whether the Petitioner's fingerprints were on the pistol or the bullet. Trial counsel did not know if any proof was adduced at trial that the pistol belonged to the Petitioner. Trial counsel believed the Petitioner was convicted because Officer Falatko testified that he saw the Petitioner pointing a weapon at him. Trial counsel opined that hiring a fingerprint expert was not necessary.

Trial counsel did not recall the sentencing hearing. He did not interview anyone to see if they could testify favorably for the Petitioner at the sentencing hearing. Trial counsel

- 6 -

said that he had many conversations with the Petitioner's mother but that he "[a]pparently" did not think about calling her as a witness at the sentencing hearing "because I didn't do it." Trial counsel stated that he did not think it was necessary to argue for leniency given who the judge was.

Trial counsel recalled proof being presented at trial that the Petitioner was removed from a fence, but trial counsel could not recall who had removed the Petitioner from the fence. Trial counsel did not recall investigating whether paramedics removed the Petitioner from the fence. Trial counsel did not have any recollection of having seen the paramedics' post-run report but believed he would have if it were part of the record.

Trial counsel agreed that after the shooting, the police "found a bunch of shotgun[s], pistol, a bunch of ammunition" in a nearby apartment. He agreed that he objected, arguing that a witness should not be able to testify about what was found in the apartment. When asked why he did not cite Tennessee Rules of Evidence 403 and 404(b) when objecting, trial counsel said, "I don't know what my reason was at the time. If I objected to it and the judge overruled, that was the end of that, we moved on to something else."

Trial counsel recalled that prior to trial, he requested Officer Falatko's statement, arguing that it was either *Jencks* or *Brady* material. *See Brady v. Maryland*, 373 U.S. 83 (1963); *Jencks v. United States*, 353 U.S. 657 (1957). Trial counsel explained that he wanted to examine the statement for inconsistencies with Officer Falatko's trial testimony. However, the trial court ruled that the defense was not entitled to the statement.

Trial counsel did not recall whether the police conducted a gunshot residue test on the Petitioner. He also did not recall gunshot residue being an issue in the case, but he stated that "as a matter of routine," he would have been interested in investigating whether a gunshot residue test was performed. He said he would agree with the record if it showed that on cross-examination he asked the officers if a gunshot residue test had been performed and they said there was no record of such a test being performed.

On cross-examination, trial counsel said that he was not involved in the delayed motion for new trial and subsequent appeal when Officer Falatko's statement was provided to appellate counsel and was reviewed by this court. Nevertheless, trial counsel knew that this court found no material inconsistencies between Officer Falatko's statement and his trial testimony.

Trial counsel agreed that the basic facts of the case were that a group of individuals approached Mr. Higgs and, upon discovering that Mr. Higgs had no money, took his car keys. Thereafter, one of the individuals drove off in Mr. Higgs's car. After Officer Falatko arrived, Mr. Higgs pointed out the suspects. Subsequently, the shooting began. Trial

counsel said that the most incriminating fact he recalled was Officer Falatko's testimony that he saw the Petitioner pointing a gun at him and saw a muzzle flash coming from the gun. Trial counsel agreed that the gun was found next to the Petitioner. Trial counsel said that if the Petitioner's blood had been found on the gun, and the proof revealed that the gun recently had been fired, he would have taken those facts into consideration in determining whether fingerprint testing was necessary. Trial counsel said that he would have had to consider whether fingerprint testing might reveal the Petitioner's fingerprints on the gun. Without the testing, the defense was able to argue that the police failed to conduct a test that should have been performed.

Trial counsel said that he had no doubt the Petitioner was a Range II offender. Trial counsel did not analyze the Petitioner's prior convictions under the twenty-four-hour merger rule but that after examining the prior convictions when discussing whether the Petitioner should testify, trial counsel probably assumed the Petitioner qualified as a Range II offender. Trial counsel thought that even if the prior robberies had not been admitted against the Petitioner, the prior aggravated assaults, the reckless endangerment, and the burglary convictions would likely have been admissible against him. Trial counsel did not believe the trial court's determination regarding consecutive sentencing and the application of enhancement factors were inappropriate. Trial counsel acknowledged that he had not thought about robbery being a crime of dishonesty, conceding that he "did not make those kind of academic analysis." When discussing testifying with a client, trial counsel took into consideration the client's prior record as well as his personality, demeanor, and attitude, but he left the ultimate decision whether to testify to his clients.

Trial counsel could not say if there was any significance to whether the Petitioner was hanging on the fence when he was discovered or whether he was lying on the ground next to the fence, especially when the gun was found lying on the ground next to the Petitioner and a shirt with the Petitioner's blood on it was found at a co-defendant's apartment. Trial counsel noted that having the Petitioner testify would have given the State the opportunity to present its case again through cross-examination. Trial counsel said that it would have been inconsistent with his trial strategy to call character witnesses who could have been asked whether they knew about the Petitioner's prior record after keeping the Petitioner's prior record from the jury's awareness by not having the Petitioner testify.

Appellate counsel testified that she was licensed to practice law in October 2014 and that her practice was primarily criminal law. She was appointed to represent the Petitioner sometime in 2015 after he filed his initial pro se petition for post-conviction relief/delayed motion for new trial. After being appointed, she reviewed the petition and discussed what happened at trial and on direct appeal with the Petitioner. Appellate counsel also reviewed the trial transcript and noticed the issue with Officer Falatko's prior statement. Thereafter, on July 7, 2016, she filed an amended post-conviction petition and

sought a delayed motion for a new trial. Appellate counsel said that in the petition, she focused solely on trial counsel's filing a late motion for new trial, which had caused this court to address the Petitioner's issues under the plain error doctrine. She explained that she did not want to pursue any post-conviction claims so she would not prevent any further post-conviction action or to "cloud the issue." Although the delayed motion for new trial and a subsequent appeal were granted, the Petitioner was not granted relief.

Appellate counsel said that she did not raise an issue challenging the Petitioner's status as a Range II offender because, after examining the Petitioner's prior convictions, judgments of conviction, and the transcript of the sentencing hearing, the Petitioner "seemed, pretty solidly, a range two." Appellate counsel believed the effective fifty-year sentence imposed by the trial court was "ridiculous" and "outrageous," especially given the Petitioner's age, the co-defendants' sentences, and the fact that the Petitioner, who was shot in the face, was the only person injured during the incident. However, appellate counsel did not believe the sentence was "cruel and unusual" because it was a within-range sentence. She could not recall whether she researched the issue of cruel and unusual punishment but stated that she usually performed research on the "leading law on kind of whatever comes up."

Appellate counsel did not raise an issue regarding the suppression of the weapons and ammunition found in the apartment. After the shooting, the police had followed one of the suspects to the apartment and that inside the apartment, the police found the Petitioner's blood on a red t-shirt that belonged to one of the suspects. Appellate counsel said it seemed logical that the police followed the suspects into the apartment and discovered the weapons and other evidence. She did not have any independent memory of researching the possibility of suppressing the evidence found in the apartment, but she asserted that she would have done cursory research on the issue.

Appellate counsel said that she thought whether "*Garrity* statements are able to be used for impeachment, as long as the officer is not being charged" was an issue that needed more clarification from our supreme court. She said that in her brief, she pointed out several inconsistencies between Officer Falatko's statement and his trial testimony. She noted that it was always helpful to be able to impeach a witness with an inconsistent statement.

Appellate counsel acknowledged that she could have argued that the State's failure to turn over Officer Falatko's statement to the Petitioner constituted a *Brady* violation. She said that "[a]t the time," she thought the issue was resolved because the trial court had ruled the State was not required to turn over the statement. She explained that she thought the State was "covered" by the trial court's "ruling and *Garrity* at the time, because the Judge said it can't be used against him."

Appellate counsel said that in a "normal post-conviction," she would have contended that trial counsel was ineffective by failing to argue that the trial court should not have sentenced the Petitioner to the maximum sentence in the range but that she chose not to raise the issue in the delayed motion for new trial and subsequent appeal. She explained that in a post-conviction proceeding, witnesses could testify regarding mitigation factors and medical records showing the Petitioner's injuries could be introduced but that such evidence might not be allowed in a delayed motion for new trial and subsequent appeal. She did not feel she could have made a good argument regarding sentencing and thought the better course was to challenge the State's failure to produce Officer Falatko's statement.

Appellate counsel said that she had planned to file a Rule 11 application for permission to appeal to the supreme court. However, several weeks prior to the deadline, the Petitioner filed his own Rule 11 application. Appellate counsel "went with what he filed, rather than amending it." She acknowledged that she did not file a motion to withdraw within fourteen days of this court's opinion being released. *See* Tenn. Sup. Ct. R. 14. Instead, she filed a motion to withdraw on a later date, so she would not be held responsible for the Petitioner's Rule 11 application. This court denied the motion to withdraw. The supreme court subsequently denied the Petitioner's pro se Rule 11 application.

On cross-examination, appellate counsel testified that the appeal she filed concerned a single issue, Officer Falatko's prior statement. She explained that she filed a motion to withdraw after the Petitioner filed a Rule 11 application because the Petitioner's next step would be to file for post-conviction relief, and she did not want to be counsel of record so the Petitioner could challenge her effectiveness at the delayed motion for new trial and subsequent appeal.

Appellate counsel said that she limited the issues she raised on appeal to prevent the issues from being previously determined so the Petitioner could raise the issues on post-conviction. She acknowledged that trial counsel knew about the existence of Officer Falatko's statement to internal affairs prior to trial and that he raised the issue regarding the admissibility of the statement. At trial, the trial court initially was uncertain whether the statement should be turned over to the defense but ultimately ruled that it was a *Garrity* statement which precluded its admission at trial. On appeal, this court agreed with appellate counsel that the statement was not material and precluded by *Garrity*.

Appellate counsel acknowledged that the apartment belonging to one of the suspects was searched and items such as weapons were recovered. She agreed that the Petitioner "having shot one of the individuals who was with him, attempted to assist him over the fence, but he became caught on the fence and that individual then fled." Later, when the

police searched the apartment, they discovered t-shirt with what appeared to be fresh blood on it that was later confirmed to be the Petitioner's blood. Accordingly, appellate counsel thought the Petitioner was "completely inextricably linked to the crime."

Appellate counsel believed the Petitioner was "pretty solid[ly]" a Range II offender, but she could not recall how much she researched that issue. She noted that this court found that there were no material inconsistencies between Officer Falatko's trial testimony and his statement to internal affairs and that the proof against the Petitioner was overwhelming.

Sergeant Alisa Styles testified that she was the keeper of the jail records and that part of her job was keeping the records of when attorneys visited their clients in jail. She said that the jail retained written records for only three years but that she was able to discern from the computer records that trial counsel visited the Petitioner in jail on two occasions: February 8, 2011, and March 3, 2011. She acknowledged that occasionally visits which were written in the logbooks were not properly transferred to the computer. On cross-examination, Sergeant Styles explained that the written logbooks occasionally reflected "pop up visits" that the computer system did not reflect. She said the jail did not keep records of when an attorney visited an inmate in the lock-up area or the visitation rooms off of the courtroom because those visits were not conducted inside the jail.

Post-conviction counsel submitted his subpoena for jail visitation records as an exhibit. The post-conviction court noted that the subpoena reflected that post-conviction counsel had requested jail visitation records from January 1, 2011, through December 31, 2012.

Mr. Joseph Ervin testified that in August 2009, he worked for the Memphis Fire Department. Even after viewing the "post-run report," Mr. Ervin had no independent memory of responding to a shooting call at an apartment complex in Frayser at approximately 1:15 a.m. on August 3, 2009. Mr. Ervin stated that the post-run report was written by Mr. Todd Mahoney, who, along with Mr. Ervin, signed the report. At the time of the post-conviction hearing, Mr. Mahoney was deceased.

Mr. Terry Higgs testified that in August 2011, he testified at the Petitioner's trial that he was present when the suspects began shooting and that he was struck in his side by buckshot. When asked if he sought medical treatment, Mr. Higgs said, "Well they came but I didn't go to the hospital. I went downtown instead." Mr. Higgs recalled that three men were in front of him and shot at him and Officer Falatko. After one of the men was shot, Officer Falatko went to the man and identified him. Mr. Higgs agreed that he heard both shotguns and pistols firing toward him and Officer Falatko. Mr. Higgs said he was unable to see who was firing, noting that "they was at the fence shooting. Once someone

got shot[,] the police was with me, he went and identified him." Although Mr. Higgs never saw any of the suspects' faces, Officer Falatko saw them. Mr. Higgs recalled testifying at the preliminary hearing, but he did not remember saying that "once he shot the shotgun I ran. I don't know if it was a shotgun and a pistol but I heard a shotgun." He insisted that all three men fired weapons at him and Officer Falatko and that the men had a shotgun and two pistols. After being played a portion of his preliminary hearing testimony, Mr. Higgs agreed that he said that he did not know if the men fired a pistol in addition to firing a shotgun.

On cross-examination, Mr. Higgs testified that he consistently stated that he heard a shotgun blast then felt himself being struck by shotgun pellets. Afterward, he ran toward his apartment. He had been beside Officer Falatko and heard the officer returning fire after the suspects shot at them. Mr. Higgs said he either heard a shotgun followed by pistols or pistols followed by a shotgun; regardless, all three guns were fired. He stated:

> All three of them [were] shooting. And as, well, I got hit, he went towards them, the officer went towards them and somebody had a ski mask on and that's when he got all three of them and identified them.
>
> . . . .
>
> They got stuck on the fence. . . . They got stuck – after they got stuck on the fence and the officer ran and got them and identified all three of them or whatever. They was trying to get back to Greenbriar Apartments. The officer ran and identified them and the mask came off or whatever happened.

Mr. Higgs said he went inside his apartment and left Officer Falatko outside to handle the situation.

The Petitioner's mother, Ms. Dannette Michelle Turner, testified that the Petitioner was in her custody from the time he was born until he was twenty-two years old and was arrested for the charges related to the shooting involving Mr. Higgs and Officer Falatko. Ms. Turner said that the Petitioner was left-handed and that he was an active, good-hearted child who loved his family and friends. She said that he did well in school and that starting in the seventh grade, he played football and basketball and was a good athlete. She stated that she and the Petitioner's girlfriend hired trial counsel to represent the Petitioner. Trial counsel never spoke with Ms. Turner about testifying at the sentencing hearing. If she had been called, Ms. Turner would have testified about the Petitioner's positive history. Trial counsel never asked Ms. Turner about the names of the Petitioner's coaches. When asked if she would have asked for leniency at the sentencing hearing, Ms. Turner replied, "I don't think he should have been sentenced. For what? I mean, because I don't know what he

- 12 -

did to even be sentenced." She agreed that if the Petitioner had received a lighter sentence, he could have led a productive life. She retrieved the paramedics' post-run report from the fire department prior to the Petitioner's trial. She asked trial counsel if he wanted to see the report, and he responded that he did not because he did not think it would be helpful.

On cross-examination, Ms. Turner agreed that she did not believe the Petitioner was guilty of the offenses for which he was convicted, that she would have testified to that effect at the sentencing hearing, and that she would have said she did not believe the Petitioner should accept responsibility because she did not think he was guilty. Ms. Turner said she did not know about the Petitioner's twelve prior felony convictions; instead, she thought he had been convicted of perhaps two felonies. She knew that he had been convicted of a domestic assault involving the mother of his child. Ms. Turner was not aware that the Petitioner had been placed on probation and that the probation had been revoked because of new charges. She knew that he had been convicted in 2007 for two counts of attempted aggravated assault, attempted aggravated burglary, and reckless endangerment.

The Petitioner testified that trial counsel began representing him in February 2011 and that the trial occurred in August 2011. Trial counsel met with the Petitioner twice in jail prior to the trial. Occasionally, they spoke on court dates, but "they wasn't lawyer-client meetings, they was just, you know, show his face and let me know they set me off. Stuff like that." The Petitioner said trial counsel never asked for his version of events; instead, trial counsel referred only to the discovery. The Petitioner did not volunteer his version of events, noting that he "wasn't just no veteran." He acknowledged that trial counsel gave him a copy of the discovery and said that trial counsel instructed him to review it alone. During the two jail meetings, trial counsel asked the Petitioner if he wanted to testify. The Petitioner initially "didn't see nothing wrong" with testifying until trial counsel cautioned him that the State could impeach him with his prior convictions. The Petitioner said that he "went with [trial counsel's] energy," which suggested that the Petitioner should not testify. However, the Petitioner acknowledged that trial counsel never said that he should not testify or gave an opinion regarding whether he should testify. Trial counsel did not mention which prior convictions could be used to impeach the Petitioner. The Petitioner said, "I knew that even though it wasn't bad as it looked – seems, you know, all them felonies and only one – really one felony but different counts, that's what I was thinking about." Trial counsel did not advise the Petitioner of the advantages of testifying. The Petitioner said he probably would have testified if trial counsel had explained how important it was to give his side. The Petitioner did not begin the trial intending to testify. Trial counsel never explained that he could file a pretrial motion to have the trial court to rule upon which prior convictions the State could use to impeach the Petitioner. If the Petitioner had known such a motion could have been filed, he would have wanted the motion to be filed. He thought, however, that if the trial court had ruled that

his prior convictions could not have been used to impeach him, trial counsel's "energy" would have been different, and the Petitioner would have testified. The Petitioner said he would have testified even if the trial court excluded his assault and reckless endangerment convictions but ruled that the State could still ask him about his robbery and burglary convictions.

The Petitioner stated that if he had testified, he would have told the truth and that his testimony would have been:

> I grew up in that area, so I hang out – that's my hang out place and the cut where I was shot at is like a community cut. Like, it lead to four different directions, people be in and out that cut on the regular. So, as I was leaving the apartments, going home, going through the cut – as I made it through the cut to the Bayou Square Apartments, I heard, like, somebody say, "There they go." And like Officer Falatko said in his statement, he didn't announce he was even on the scene until after I went down. So, when I heard, "There he go – there they go," that's all that I remember because I was shot. So, all this commotion and chaos going on and I didn't find out the reason they were saying, "There they go" is because this guy was supposed to have been robbed of his car, but I don't have a robbery charge. Terry Higgs never pointed me out, said that I robbed anybody, so I know he couldn't have been talking about I'm the person that he pointed out because I wasn't convicted of a robbery charge. I was charged with one at the beginning for whatever the reason may be, but before the trial, they dismissed it. So, I wasn't ever charged with a robbery, so I would have told them the truth . . . .

The Petitioner denied involvement in the robbery.

The Petitioner asserted that Mr. Higgs was specific about the people who robbed him and knew the suspects' names and that the Petitioner was not sure "how I end up with the charge." The Petitioner said he was leaving Greenbriar Apartments and was going home through "the cut" when he was shot. He denied ever shooting at anyone or hanging from a fence that night. He said he was shot while he was on the other side of the fence. After he was shot, he staggered and fell to the ground. A man tried to help the Petitioner over the fence because "all of us, you know, we grew up in that area." The Petitioner said that he was shot in the mouth and that he was bleeding everywhere, which could have explained how his blood got on a shirt that was found in the apartment.

The Petitioner acknowledged that the proof revealed that a gun was found lying next to him but testified that he did not know how the gun got there. He said that he was shot in the mouth and that the bullet exited behind his ear. He was in the hospital for nine days

and continued to suffer damage from the shooting. He said the muscles were dead on the right side of his face. He could not smile because he could not move the side of his lip. His face sweated when he ate, he was missing teeth, and he had a hole in the roof of his mouth.

The Petitioner testified that trial counsel did not hire an investigator. The Petitioner asked trial counsel to obtain the paramedics' post-run report, the gunshot residue results, and the fingerprint results, but trial counsel responded that those materials were not in the discovery and were not available. The Petitioner said that his mother mailed him the paramedics' post-run report and that the first time he saw it was right before his trial. He did not think it was relevant and did not show it to trial counsel. The Petitioner also said that he was not aware Officer Falatko was going to testify that he cut the Petitioner down from the fence. The Petitioner acknowledged that trial counsel had requested a statement Officer Falatko had made but that the request was denied.

The Petitioner said that the discovery indicated that the offense was only an aggravated assault and that he was originally charged with two counts of aggravated assault. However, the indictment was superseded, and he was charged with two counts of attempted first degree murder, employing a firearm, and aggravated robbery.

The Petitioner agreed that this court filed its opinion regarding his delayed appeal on July 31, 2017, and that shortly afterward he received a copy of the opinion in the mail. Afterward, the Petitioner called appellate counsel, who told him that "she was through with it" or that she was not going to file a Rule 11 application for permission to appeal to the supreme court. The Petitioner believed appellate counsel "was under the impression that she did what she had to" and that her job was through. Accordingly, after doing some research, the Petitioner filed his own application for permission to appeal so that it would be timely. On October 20, 2017, appellate counsel filed a motion to withdraw, but this court denied the motion.

The Petitioner stated that his co-defendants were found in an apartment that was "unknown" to him. In that apartment, the police found "four or five weapons and ammunition." Trial counsel objected to the admission of the weapons and ammunition, but he did not seek exclusion pursuant to Tennessee Rule of Evidence 404. The Petitioner complained, "I had no connection to that. I only had three or four guns and different ammunition that had nothing to do with the case and I was kind of unhappy because [trial counsel] didn't go a little harder about that." The trial court overruled trial counsel's objection. The Petitioner thought it appeared as if he were in control of all of the guns. He further complained that his co-defendants received sentences of only four years and that trial counsel never argued at the sentencing hearing that it was disproportionate for the

- 15 -

Petitioner to receive a sentence of fifty years. The Petitioner and trial counsel never discussed the sentencing hearing.

On cross-examination, the Petitioner said that if he had testified at the sentencing hearing, he would have insisted he did not commit the offenses for which he was charged. When asked if he would have blamed his co-defendants, the Petitioner said, "I'm not sure[,] . . . it would have been something to that effect." He stated that if he had been asked about his twelve prior felonies, he would have explained that

> I can understand that it's two different felonies, but it wasn't aggravated and it was the people – it was, like, multiple people. It wasn't' that I went to Frayser and committed a felony, and went to 201 Poplar and committed a felony, just something I got a habit of doing. It just was the people there, I would have explained that to him, so – you know, y'all make it sound so bad and I would have tried to explain that to him.

> . . . .

> . . . . I had one felony conviction, it just was the people – it just was multiple people.

The Petitioner acknowledged that in 2007, he pled guilty to three counts of robbery and one count of attempted aggravated robbery. He further acknowledged that in another case in 2007, he pled guilty to attempted robbery, attempted aggravated assault, reckless endangerment involving a deadly weapon, and two counts of attempted aggravated burglary. Finally, he acknowledged that he pled guilty in a third case in 2007 to three counts of attempted robbery.

The Petitioner agreed that trial counsel was not obliged to raise a motion he did not think he could win or that the law did not support. The Petitioner said trial counsel told him his prior convictions could be used to impeach him if he testified. The Petitioner stated that if he had testified, he would have explained his "side of the story" by denying any involvement in the crimes and saying he became implicated in the crimes because he lived in the area. He was reluctant to be more specific about his prospective trial testimony, saying, "The details of the case would be relevant if I was retried or had another trial. So, we'll cross that road if I have to, but I just basically want to just point out how I was violated in my post conviction."

The Petitioner agreed that Ms. Shaterika Rufus testified at trial that she saw the Petitioner "with the co-defendant and carrying a long gun" and that other testimony at trial showed that the Petitioner was found hanging on a fence or on the ground near the fence

- 16 -

with spent shell casings nearby. The Petitioner further agreed that the proof at trial showed that one of the suspects was wearing a red shirt and that a red shirt with his blood on it was found in the apartment and that the gun found at his feet had his blood and DNA on it. The Petitioner testified that he did not know how his blood got on the red shirt or the gun but that he was bleeding and that his blood was everywhere. He said that during trial, trial counsel asked "a TBI lady" who was "named something Curver" whether gunshot residue tests or fingerprint tests had been performed regarding the Petitioner, and she said that the tests were not requested for the Petitioner.

The Petitioner acknowledged that although his family retained trial counsel to represent him, he did not think his family provided trial counsel with the funds to hire an expert to conduct independent gunshot residue tests or fingerprint tests, but he contended that they were not "too familiar with the law at the time." The Petitioner said his co-defendants' gunshot residue tests and fingerprint tests were negative.

The Petitioner conceded that trial counsel did not threaten him to make him not testify, but the Petitioner asserted, "His energy – my lawyer – I was 22. His energy – he didn't have to threaten me, he told me it wouldn't be good. I'm not no veteran." The Petitioner said that after this court issued its opinion on his delayed appeal, he contacted appellate counsel, who told him, "I'm through." The Petitioner then filed his own Rule 11 application for permission to appeal to the supreme court. He said trial counsel had represented him on his previous cases.

On redirect examination, the Petitioner testified that on February 16, 2007, he entered guilty pleas to all twelve of his prior felonies. The charges arose from two separate crimes, one of which occurred on September 17, 2005, and the other which occurred on August 20, 2006.

The post-conviction court denied relief. On appeal, the Petitioner contends that:

(1) trial counsel and appellate counsel were ineffective by failing to argue that the Petitioner was a Range I, standard offender for his two attempted first degree murder convictions;
(2) trial counsel and appellate counsel were ineffective by failing to argue that the Petitioner's fifty-year-sentence was cruel and unusual and appellate counsel was ineffective by failing to argue that the trial court erred in sentencing the Petitioner at the top of Range II for his attempted first degree murder convictions;
(3) trial counsel was ineffective by failing to file a motion to have a pretrial Rule 609 hearing;

(4) trial counsel was ineffective by failing to explain to the Petitioner the "pros" of testifying;

(5) trial counsel was ineffective by failing to impeach Mr. Higgs with his preliminary hearing testimony;

(6) trial counsel was ineffective by failing to retain an independent fingerprint expert;

(7) trial counsel was ineffective by failing to interview the paramedics who responded to the scene on the night of the incident;

(8) trial counsel was ineffective by failing to adequately meet with the Petitioner;

(9) trial counsel was ineffective by failing to adequately represent the Petitioner at the sentencing hearing;

(10) trial counsel and appellate counsel were ineffective by failing to cite Tennessee Rules 403 and 404(b) when arguing against the admission of weapons and ammunition recovered from a co-defendant's apartment;

(11) appellate counsel was ineffective by failing to argue that the State's failure to turn over Officer Falatko's statement was a *Brady* violation; and

(12) appellate counsel was ineffective by failing to file a Rule 11 application.

The Petitioner also argues that he was entitled to post-conviction relief due to cumulative error and that the post-conviction court erred in denying his request for funding for a fingerprint expert.

## ANALYSIS

A petitioner may request post-conviction relief by asserting grounds alleging that his conviction or sentence is void or voidable because it abridged his constitutional rights provided by the Tennessee or the United States Constitutions. T.C.A. § 40-30-103. To obtain post-conviction relief, a petitioner must prove the allegations of fact made in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f). On appeal, the post-conviction court's findings of fact are conclusive unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). "[Q]uestions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001) (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). Additionally, appellate courts may not "substitute their own inferences for those drawn by the trial court." *Id.* (citing *Henley*, 960 S.W.2d at 579). This court reviews "a post-conviction court's conclusions of law, decisions involving mixed questions of law and fact, and its application of law to its factual findings de novo without a presumption of correctness." *Whitehead v. State*, 402 S.W.3d 615, 621 (Tenn. 2013) (citations omitted).

A criminal defendant has a right to the assistance of counsel under the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). The right to assistance of counsel inherently guarantees that counsel's assistance is "effective." *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984); *Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). To prove that counsel was ineffective, a petitioner must show that (1) counsel performed deficiently and (2) such deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687-88.

To establish deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. This standard requires a petitioner to demonstrate that the "services rendered or the advice given" were "'below the range of competence demanded of attorneys in criminal cases.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). Counsel must have made errors so serious that counsel was not functioning as the "'counsel'" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. Measuring counsel's performance requires giving deference to counsel's decisions, and courts must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 669. Accordingly, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). The reviewing court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland* 466 U.S. at 689).

"[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Adequate preparation includes counsel's "duty to make reasonable investigation or to make a reasonable decision that makes particular investigations unnecessary." *Burns*, 6 S.W.3d at 462 (quoting *Strickland*, 466 U.S. at 691).

To demonstrate that a counsel's deficient performance prejudiced the defense, a petitioner must prove "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Dellinger*, 279 S.W.3d at 294 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because a petitioner must establish both deficiency and prejudice to prove ineffective assistance of counsel, a court need not address both prongs where the petitioner has failed to establish

one of them. *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

To establish ineffective assistance of counsel on appeal, a petitioner must demonstrate that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent appellate counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Campbell v. State*, 904 S.W.2d 594, 597 (Tenn. 1995). "Appellate counsel are not constitutionally required to raise every conceivable issue on appeal." *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). "Generally, the determination of which issues to present on appeal is a matter which addresses itself to the professional judgment and sound discretion of appellate counsel." *Campbell*, 904 S.W.2d at 597. A reviewing court gives "considerable deference" to counsel's judgment regarding which issues to raise on appeal, so long as the choices are within the "range of competence required of attorneys in criminal cases." *Carpenter*, 126 S.W.3d at 887. "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome,'" although the Tennessee Supreme Court has declined to hold that this is the "*only* way to show" deficiency. *Id.* at 888 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). When a claim of ineffective assistance of counsel is premised on the failure to preserve an issue on appeal, the reviewing court should determine the merits of the omitted issue. *Carpenter*, 126 S.W.3d at 888. "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* The strength of the omitted issue also has bearing on whether failure to raise the issue resulted in prejudice. *Id.*

### *(1) Sentence Range*

The Petitioner contends that trial counsel and appellate counsel were ineffective by failing to argue that he was a Range I, standard offender because the "twenty-four-hour merger rule" should have applied to his prior convictions of robbery. We note that the Petitioner was convicted of two counts of attempted first degree murder, a Class A felony, and one count of employing a firearm during the commission of a dangerous felony, a Class C felony. *Rodney Turner*, 2013 WL 6706092, at *1. He was sentenced as a Range II, multiple offender and received concurrent sentences of forty years for both counts of attempted first degree murder. *Id.* Additionally, he received a ten-year sentence for the employment of a firearm conviction, which was to be served consecutively to the forty-year sentences, for a total effective sentence of fifty years. *Id.*

At the time of the offenses, a Range II, multiple offender was defined as a defendant who has received "[a] minimum of two (2) but not more than four (4) prior felony convictions within the conviction class, a higher class, or within the next two (2) lower

felony classes" or "[o]ne (1) Class A prior felony conviction if the defendant's conviction offense is a Class A or B felony." T.C.A. § 40-35-106(a). Therefore, for the Petitioner to have qualified as a Range II offender, he must have had one prior Class A felony or at least two but no more than four prior Class B or C felonies to affect his Class A felony convictions of attempted first degree murder and any two to four class felony convictions to affect his Class C felony conviction of employing a firearm during the commission of a dangerous felony. The statute further provides that "[e]xcept for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions." T.C.A. § 40-35-106(4). "This is commonly known as the twenty-four-hour merger rule." *State v. Terry Charles Jordan*, No. M2016-01067-CCA-R3-CD, 2017 WL 2782204, at *3 (Tenn. Crim. App. June 27, 2017).

During the Petitioner's testimony, he acknowledged that he had three prior convictions of robbery, one prior conviction of attempted aggravated robbery, four prior convictions of attempted robbery, one prior conviction of attempted aggravated assault, one prior conviction of reckless endangerment involving a deadly weapon, and two prior convictions of attempted aggravated burglary. Robbery and attempted aggravated robbery are Class C felonies. *See* T.C.A. §§ 39-13-401(b) (robbery), -13-402(b) (aggravated robbery), -12-(107)(a) (classification of attempt). Accordingly, the Petitioner had four prior Class C felony convictions and was properly classified as a Range II, multiple offender.

On appeal, the Petitioner contends that his convictions in case number 06-09513, three counts of robbery and one count of attempted aggravated robbery, all stemmed from a single criminal episode and, therefore, should be considered as a single offense for the purposes of sentencing enhancement under the twenty-four-hour merger rule. He argues "that the offense of robbery does not involve 'serious bodily injury, bodily injury, threatened serious bodily injury, or threatened bodily injury.'" He acknowledges, however, that several unreported decisions from this court are contrary to his position. *See Jaime Lynn Middlebrook*, No. M2009-02276-CCA-R3-CD, 2011 WL 198689, at *7 (Tenn. Crim. App. Jan 11, 2011); *State v. Elmi Abdulahi Abdi*, No. M2009-01614-CCA-R3-CD, 2010 WL 2977892, at *6 (Tenn. Crim. App. July 29, 2010); *State v. Darrell Johnson*, No. W2008-01725-CCA-R3-CD, 2009 WL 1564808, at *3 (Tenn. Crim. App. June 3, 2009). Notably, "[t]his court has previously held that robbery, and by extension aggravated robbery, contains an element that the defendant cause or threaten to cause bodily injury." *State v. Willie Lee Hughes, Jr.*, No. M2015-01688-CCA-R3-CD, No. M2015-01207-CCA-R3-CD, 2016 WL 6956804, at *4 (Tenn. Crim. App. Nov. 29, 2016). The Petitioner argues that even in the face of adverse authority, trial counsel and appellate counsel should have pursued this issue because our supreme court has not ruled on the issue. The post-

conviction court noted that both trial counsel and appellate counsel testified that they did not believe case law supported an argument that the Petitioner was a Range I offender. The State argues that the post-conviction court correctly concluded that "[c]ounsel [are] not required to present frivolous or unfounded claims that are not supported by precedent, to provide effective assistance of counsel." We agree. The Petitioner is not entitled to relief on this basis.

*(2) Cruel and Unusual Punishment*

The Petitioner contends that trial counsel and appellate counsel were ineffective by failing to argue that his effective fifty-year sentence violates the prohibition against cruel and unusual punishment. He further contends that appellate counsel was ineffective by failing to argue that the trial court erred by sentencing the Petitioner at the top of the range for his convictions of attempted first degree murder. The Eighth Amendment, which is applied to the states through the Fourteenth Amendment, prohibits cruel and unusual punishment and requires that the punishment imposed must be proportional to the severity of the offense in the capital case context. *State v. Harris*, 844 S.W.2d 601, 602 (Tenn. 1992). The State responds that because the Petitioner received a within-range sentence, raising a constitutional challenge to the sentence would have been frivolous and unsuccessful.

The post-conviction court accredited the testimony of appellate counsel, who said that while she thought the Petitioner's fifty-year sentence was "ridiculous," she did not think it was cruel and unusual because it was a within-range sentence. The post-conviction court noted that the Petitioner's concurrent sentences of forty years for his Class A convictions of attempted first degree murder were the maximum allowed for a Range II offender. *See* T.C.A. § 40-35-112(b)(1). Further, the Petitioner's conviction of employing a firearm during the course of a dangerous felony was statutorily required to be served 100% in confinement and consecutively to the underlying felony convictions. *See* T.C.A. § 39-17-1324(c). The post-conviction court also noted that the Petitioner had a lengthy criminal history. The post-conviction court concluded, "Because the sentence that Petitioner received was within the statutory range, Petitioner's sentence was not cruel and unusual and for the same reasons it lacked merit to argue." This court has previously held that "a punishment imposed within the statutory limits for that offense and according to this state's sentencing principles does not violate constitutional proscriptions against cruel and unusual punishment. Therefore, any sentence within the statutory guidelines cannot be considered excessive." *State v. Sammie Lee Taylor*, No. 02C01-9501-CR-00029, 1996 WL 580997, at *23 (Tenn. Crim. App. Oct. 10, 1996) (citing *State v. Flynn*, 675 S.W.2d 494, 499 (Tenn. Crim. App. 1984); *State v. French*, 489 S.W.2d 57, 60 (Tenn. Crim. App. 1972)). Therefore, the court determined that neither trial counsel nor appellate counsel were deficient for raising the issue of cruel and unusual punishment and that appellate

counsel was not deficient for failing to challenge the imposition of the maximum sentence within the range for the convictions of attempted first degree murder. We agree. Further, the Petitioner did not suffer any prejudice from the failure to challenge sentencing. He is not entitled to relief.

*(3) Mitigation Proof*

The Petitioner contends that trial counsel was ineffective in his representation at the sentencing hearing by not presenting mitigation proof, such as the Petitioner's mother or his high school coach, or arguing for leniency. The Petitioner maintains that his mother could have testified about his athletic ability and said that he was a child with a good heart who loved his friends and family. He also maintains that his coach could have testified that he had "exceptional athletic talent and [a] good attitude." He contends that there is a reasonable probability that this proof would have led the trial court to impose a lesser sentence. The State responds that neither the Petitioner's mother nor his coach were aware of the Petitioner's lengthy criminal history; therefore, the decision to call these witnesses who were not familiar with his history could not be deemed deficient.

The post-conviction court found that the Petitioner was not prejudiced by trial counsel's failure to call the Petitioner's mother or coach as witnesses at the sentencing hearing because their testimony "would not have been considered mitigation." The post-conviction court noted that trial counsel thought mitigation proof was not necessary "because he knew who the judge was in this case." The post-conviction court further noted that neither the Petitioner's mother nor his coach knew about the Petitioner's prior convictions, and that, therefore, their testimony "would likely not [have] been considered as mitigation or persuasive." Additionally, the Petitioner's mother was insistent that the Petitioner was innocent of the charged offenses. The post-conviction court found, "Based upon her testimony at the [e]videntiary hearing, she would not have likely been successful in convincing the trial court of a lenient sentence." The post-conviction court found that the Petitioner was correctly sentenced as a Range II, multiple offender and that his sentences were enhanced based upon his prior convictions. The record does not preponderate against the findings of the post-conviction court.

In a related issue, the Petitioner contends that appellate counsel was ineffective by failing to argue in the motion for new trial and on appeal that the trial court erred by sentencing the Petitioner at the top of Range II for his attempted first degree murder convictions. The Petitioner contends that the sentences were "'greater than that deserved for the offense committed'" and were "not the 'least severe measure necessary to achieve the purposes for which the sentence[s were] imposed.'" The post-conviction court found that there was no merit to argue the Petitioner should have received a lesser sentence, especially given his lengthy criminal history and the within-range sentence. The post-

- 23 -

conviction court concluded that appellate counsel was not deficient in this regard. We agree. The Petitioner is not entitled to relief in this regard.

### (4) Pretrial Rule 609 Hearing

The Petitioner contends that trial counsel was ineffective for failing to file a motion for a pretrial Rule 609 hearing to determine whether any prior convictions of the State could be used for the purpose of impeaching the Petitioner's testimony. *See State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976); *see also* Tenn. R. Evid. 609. Tennessee Rule of Evidence 609 provides that a prior conviction may be used to impeach a witness, so long as certain requirements are met. "The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement." Tenn. R. Evid. 609(a)(2). If the witness to be impeached is the accused, the trial court "must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3).

In weighing the probative value and the prejudicial impact of the prior convictions, the trial court must particularly consider two criteria: (1) the relevance of the prior conviction to the defendant's credibility; and (2) the similarity of the prior conviction to the crime for which the defendant is on trial. *State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999). While any felony may be "generally probative" of the defendant's credibility, not all felonies are therefore admissible. *State v. Waller*, 118 S.W.3d 368, 371 (Tenn. 2003). Instead, the trial court must determine the degree to which the felony conviction is probative of credibility by analyzing whether it involves dishonesty or false statement. *Id.* Furthermore, "evidence of convictions for the same type of crime should be admitted sparingly because of the impression on jurors that if a person committed a crime in the past, he committed the offense for which he is on trial." *State v. Russell*, 382 S.W.3d 312, 317 (Tenn. 2012).

The Petitioner argues that trial counsel was deficient by not filing a motion seeking a pretrial Rule 609 hearing arguing that the State should not be allowed to impeach him with his prior convictions as they were too similar to the facts charged at trial. The State responds that case law has established that robbery is a crime of dishonesty and is probative of credibility and that crimes of violence are probative of credibility. We note that the Petitioner testified that he was charged with two counts of attempted first degree murder, employing a firearm, and aggravated robbery. As such, we agree with the post-conviction court that "it may have been helpful to conduct a hearing to determine which convictions were going to be allowed to be used to impeach his testimony if he had testified."

To this end, we note that this court has explained that, "[r]elative to credibility, violent crimes might reflect on the moral character of a witness and therefore are not without probative value on credibility. However, the link between [violent] crime and truthfulness is, at best, weak and the potential prejudice is significant." *State v. Stevie Williamson*, No. W2019-00437-CCA-R3-CD, 2020 WL 1274770, at *5 (Tenn. Crim. App. Mar. 16, 2020), *perm. to appeal denied* (Tenn. Nov. 17, 2020) (citations and internal quotation marks omitted). We further note that the Tennessee Supreme Court has previously determined that robbery is a crime of dishonesty and is probative of credibility. *State v. Caruthers*, 676 S.W.2d 935, 941 (Tenn. 1984). Additionally, the offense of burglary is "'highly probative of credibility'" because it is a crime of dishonesty. *See State v. Baker*, 956 S.W.2d 8, 15 (Tenn. Crim. App. 1997). This court has held that even if a prior conviction involves the same or similar crime for which the defendant is being tried, it does not automatically require its exclusion. *See id.*; *State v. Miller*, 737 S.W.2d 556, 560 (Tenn. Crim. App. 1987). However, if "the prior conviction and instant offense are similar in nature the possible prejudicial effect increases greatly and should be more carefully scrutinized." *Long v. State*, 607 S.W.2d 482, 486 (Tenn. Crim. App. 1980). A court must analyze the prior conviction and the offense on trial to determine if the conviction's probative value on credibility is outweighed by the danger of unfair prejudice.

The post-conviction court concluded that while trial counsel might have been able to argue that the aggravated assault and reckless endangerment convictions were not probative of the Petitioner's credibility, the Petitioner's robbery and attempted aggravated robbery convictions were probative of his credibility and would have been admissible for impeachment purposes at trial. Even if the trial court had concluded that the robbery convictions were too similar to the facts adduced at trial, the Petitioner's prior conviction of attempted aggravated burglary was a crime of dishonesty and was highly probative of the Petitioner's credibility. Therefore, we agree with the post-conviction court that the Petitioner failed to demonstrate that he suffered any prejudice by trial counsel's alleged deficiency.

### (5) Right to Testify

The Petitioner alleges that trial counsel performed deficiently by not discussing with him prior to trial his right to testify. The Petitioner asserts that if he had been aware of the advantages of testifying, he would have testified at trial. He also asserts that he would have testified at trial if the trial court had "ruled that he could only be impeached with his 'robbery related convictions' and the burglary conviction." The State responds that trial counsel advised the Petitioner regarding testifying and gave the Petitioner the choice of whether or not to testify. The State contends that the Petitioner failed to establish that he was prejudiced by any alleged deficiency.

The post-conviction court found that trial counsel properly advised the Petitioner about testifying and that the Petitioner chose not to testify. The post-conviction court stated that trial counsel could not advise the Petitioner regarding any "pros" of testifying "because there were not any." The post-conviction court noted that trial counsel advised the Petitioner "that the State could re-emphasize damaging parts of its case through cross-examination." Further, trial counsel explained how the Petitioner's prior convictions could be used to impeach his credibility.

The Petitioner said that he would have testified that while he was walking through "the cut," he was shot in the mouth and that he started bleeding everywhere. He also would have testified that he did not fire a gun on the night of the incident. He would have explained that a man from the neighborhood attempted to help him after he was shot, which could have explained how the Petitioner's blood got on the red shirt and the gun.

The post-conviction court concluded that trial counsel was not deficient because he advised the Petitioner about the risks of testifying. *See Quincy Moutry v. State*, No. E2017-00353-CCA-R3-PC, 2018 WL 2465147, at *6 (Tenn. Crim. App. June 1, 2018). We agree. Moreover, had the Petitioner chosen to testify, his credibility would have been impeached with at least some of his prior convictions. The Petitioner is not entitled to relief in this regard.

### (6) Impeach Mr. Higgs

The Petitioner contends that trial counsel was ineffective by failing to impeach Mr. Higgs with his preliminary hearing testimony. The Petitioner maintains that at the preliminary hearing, Mr. Higgs said that he was not positive whether he heard a pistol being fired but that at trial, he testified that he heard pistols being fired after the shotgun blast. The Petitioner asserts that this "inconsistency" would have caused the jury to have "reasonable doubt as to whether any of the suspects were actually firing pistols on the night in question." The State contends that Mr. Higgs preliminary hearing testimony was at most "a slight equivocation" and was not inconsistent; therefore, trial counsel was not ineffective by not cross-examining Mr. Higgs "on such an insignificant matter."

The post-conviction court noted that at the post-conviction hearing, Mr. Higgs testified that he heard shots being fired from both types of pistols and a shotgun, which was consistent with his trial testimony. At the post-conviction hearing, Mr. Higgs stated that he thought he had testified the same at the preliminary hearing. However, after listening to a recording of his preliminary hearing testimony, Mr. Higgs agreed that he had testified that he was not sure he heard a shot being fired from a pistol. The post-conviction court found that Mr. Higgs's "statement was not profoundly inconsistent with the statement he made at trial. . . . Just because he appeared to be more confident about what he heard at

trial that he was at the Preliminary Hearing does not make those statements inconsistent." *See Johnson v. State*, 145 S.W.3d 97, 122 (Tenn. Crim. App. 2004) ("[W]e do not discern any clear impeachment value from such a line of questioning because the report was not necessarily inconsistent" with witness testimony). Trial counsel testified at the post-conviction hearing that he failed to see the significance of cross-examining Mr. Higgs on this alleged inconsistency. Trial counsel's decision regarding whether to cross-examine a witness regarding an issue "is a strategical or tactical choice, if informed and based on adequate preparation." *Lawrence Warren Pierce v. State*, No. M2005-02565-CCA-R3-PC, 2007 WL 189392, at *7 (Tenn. Crim. App. Jan. 23, 2007) (citing *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982)). "[S]trategic decisions during cross-examination are judged from counsel's perspective at the point of time they were made in light of the facts and circumstances at that time." *Johnnie W. Reeves v. State*, No. M2004-02642-CCA-R3-PC, 2006 WL 360380, at *10 (Tenn. Crim. App. Feb. 16, 2006) (citing *Strickland*, 466 U.S. at 690). Moreover, we note that at trial, the strongest evidence against the Petitioner was Officer Falatko's testimony that he saw the Petitioner "stop and 'square off' to fire at Officer Falatko and Mr. Higgs" and that he saw the muzzle flashes from the Petitioner's silver pistol. *Rodney Turner*, 2013 WL 6706092, at *1. Therefore, the Petitioner suffered no prejudice and is not entitled to relief. *See Darrell Carpenter v. State*, No. W2019-01248-CCA-R3-PC, 2020 WL 5626233, at *8 (Tenn. Crim. App. Sept. 18, 2020).

### (7) Fingerprint Expert

The Petitioner contends that trial counsel was ineffective by failing to hire a fingerprint expert to test the pistol found lying next to the Petitioner. He concedes that the post-conviction court correctly found that he failed to establish prejudice because he failed to present a fingerprint expert at the post-conviction hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 758 (Tenn. 1990). The Petitioner is not entitled to relief on this issue. *Perry Brent Lanham v. State*, No. W2021-00310-CCA-R3-PC, 2021 WL 5768444, at *4 (Tenn. Crim. App. Dec. 6, 2021)

The Petitioner also argues that the post-conviction court erred in denying his request for funding for an independent fingerprint expert. He acknowledges, however, that the Rules of the Supreme Court of Tennessee mandate that "[i]n non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved." Tenn. Sup. Ct. R. 13, § 5(a)(2). The Petitioner likewise acknowledges that the Tennessee Supreme Court has decided this issue in *Davis v. State*, 912 S.W.2d 689, 695 (Tenn. 1995). Regardless, he argues that his rights to due process and equal protection have been violated because capital post-conviction petitioners may be entitled to funding for expert assistance.

In *Davis*, the Tennessee Supreme Court noted that there is no statutory provision entitling post-conviction petitioners to state-funded experts. *Davis*, 912 S.W.2d at 695. The *Davis* court concluded that was there was not a constitutional right to such services, relying on the fact that neither the State Constitution nor the Federal Constitution guarantees post-conviction petitioners the right to counsel. *Id.* at 696. The *Davis* court rejected the argument that the denial of State funding for expert services could constitute a violation of due process or equal protection. *Id.* The Petitioner was not entitled to testing under *Davis*.

## *(8) Paramedics and Post-Run Report*

The Petitioner argues that trial counsel was ineffective by failing to interview the paramedics about whether they cut the Petitioner down from the fence after they arrived on the scene on the night of the incident and by failing to obtain the paramedics' post-run report. The Petitioner states that trial counsel did not recall seeing the "post-run report" that was created by the paramedics after the incident. The Petitioner maintains that he tried to give the post-run report to trial counsel but that trial counsel said he did not need to look at it and that it would not be helpful. The Petitioner contends that the State's witnesses Officer Falatko and Officer Jack Henry testified that the paramedics cut the Petitioner off the fence; however, the post-run report reflected that the Petitioner was lying on the ground when the paramedics arrived. Therefore, the Petitioner asserts that trial counsel could have impeached the State's witnesses with the post-run report and by calling the paramedics as witnesses. The State responds that any error was the Petitioner's "own doing" because he had the post-run report but did not provide it to counsel. The State contends that any inconsistency between the report and the trial proof was minimal and did not affect the overwhelming proof against the Petitioner at trial.

The post-conviction court noted that paramedic Mr. Ervin testified at the post-conviction hearing that he did not independently recall the events of the night in question. Mr. Ervin stated that his fellow paramedic, Mr. Mahoney, who was deceased at the time of the post-conviction hearing, wrote the post-run report and that Mr. Ervin signed the report. The post-conviction court further noted that trial counsel testified that he did not recall ever seeing the post-run report and that he did not recall it being in the discovery. The Petitioner testified that his mother mailed him the post-run report but that he did not show it to trial counsel because the Petitioner did not know the significance of the report. The post-conviction court found that the State's proof against the Petitioner was "overwhelming." Notably, the post-conviction court found, "Whether the Petitioner was found hanging on the fence or on the ground there was a gun found near him with his blood on it. Petitioner was seen approximately ten minutes before the shooting with two other men and armed." The post-conviction court concluded that trial counsel was not deficient. The evidence

does not preponderate against the findings of the post-conviction court.  The Petitioner is not entitled to relief in this regard.

### (9) Inadequate Meetings with the Petitioner

The Petitioner contends that trial counsel was ineffective by failing to adequately meet with him, asserting that trial counsel met with him in the jail only twice prior to trial. The State responds that the Petitioner discounts the meetings trial counsel and the Petitioner had on court dates.  The State further responds that the Petitioner provides only a generalized allegation that the outcome of trial would have been different with additional meetings; therefore, the Petitioner cannot establish prejudice.

The post-conviction court found that trial counsel testified that he met with the Petitioner and that the Petitioner testified that he met with trial counsel in jail and on court dates.  Additionally, the post-conviction court noted that the Petitioner conceded that he and trial counsel reviewed the discovery, that trial counsel provided him a copy of the discovery, and that the Petitioner reviewed the discovery on his own.  The Petitioner also conceded that they discussed whether he would testify, analyzed the prospective trial proof, and reviewed his prior record.  The post-conviction court concluded that the Petitioner failed to prove that trial counsel was deficient.  Other than speculating that more frequent meetings would have led trial counsel to better advising the Petitioner regarding whether to testify at trial, to filing a pretrial Rule 609 motion, and to being more prepared at trial, the Petitioner adduced no proof to support his contention that his meetings with trial counsel were inadequate and prejudiced him.  The Petitioner is not entitled to relief in this regard.

### (10) Rules 403 and 404(b)

The Petitioner contends that appellate counsel was ineffective for failing to argue in the motion for new trial and on appeal that the "trial court erred by allowing the State to introduce into evidence the various weapons and ammunition that were recovered" from the apartment.  In a related issue, the Petitioner contends that trial counsel was ineffective by failing to cite Tennessee Rules of Evidence 403 and 404(b) when objecting to the admission of the evidence.  The Petitioner maintains that without citing any rules of evidence in support of his objection, trial counsel objected to the admission of the evidence found in the apartment but that the objection was overruled.  The proof at trial revealed that "a red shirt with what appeared to be blood on it, a pistol, and a shotgun" were found in the apartment.  *Rodney Turner*, 2013 WL 6706092, at *2.  The Petitioner's blood and DNA were found on the red shirt.  *Id.*  Spent shell casings found by the fence where the Petitioner was discovered matched the shotgun that was recovered from the apartment.  *Id.*

- 29 -

The Petitioner, citing Tennessee Rule of Evidence 403, argues that "any probative value of the guns and ammunition found inside of this apartment was substantially outweighed by the danger of unfair prejudice." He also argues that the admission of the guns and ammunition violated Tennessee Rule of Evidence 404 (b) because it led the jury to believe he had committed other bad acts. The Petitioner contends that trial counsel and appellate counsel should have argued that the evidence recovered from the apartment should not have been admitted because the State failed to establish that the Petitioner had been inside the apartment. The State responds that trial counsel explained that he challenged the admission of the evidence on the grounds he thought were appropriate and moved on when the objection was overruled, which was a strategic decision. The State also asserts that an objection pursuant to Rule 403 would have been overruled because the proof was highly probative with little to no risk of unfair prejudice. Further, a Rule 404(b) objection would have been unsuccessful because "the existence of physical items in a certain location does not amount to evidence of 'other crimes, wrongs, or acts.'"

The post-conviction court found that at trial, trial counsel objected to the admission of the evidence found in the apartment by arguing that the State failed to make a connection between the Petitioner, the apartment, and the items therein; thus, the evidence was not relevant. Trial counsel could not recall why he did not cite Rules 403 or 404(b). Appellate counsel explained that she saw no basis to challenge the admission of the evidence because the items were recovered from an apartment that was linked to people the police tracked to the apartment, and the Petitioner had been with the same people shortly prior to the shooting. The post-conviction court concluded that any objections under Rules 403 and 404(b) would have been unsuccessful because the evidence found in the apartment was relevant.

The post-conviction court further concluded that appellate counsel made a tactical decision not to raise the issue on appeal and that appellate counsel chose to focus on a strong argument "so not to cloud the issues." A reviewing court should not second-guess strategic choices or measure counsel's performance by "'20-20 hindsight.'" *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997) (quoting *Hellard*, 629 S.W.2d at 9). The post-conviction court concluded that neither trial counsel nor appellate counsel were deficient by failing to argue Rule 403 or Rule 404(b).

Tennessee Rule of Evidence 403 provides that relevant evidence may be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. The term "unfair prejudice" has been defined as "'[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *State v. Banks*, 564 S.W.2d 947, 951 (Tenn. 1978) (quoting Fed. R. Evid. 403, Adv. Comm. Note).

Clearly, the evidence found in the apartment was highly probative of the Petitioner's guilt. Moreover, while the evidence was prejudicial toward the Petitioner in that it helped establish his participation in the crimes, it was not unfairly prejudicial. Accordingly, we agree with the post-conviction court that any objection under Rule 403 would have been unavailing. The Petitioner has failed to establish that either trial counsel or appellate counsel were deficient or that he suffered prejudice in this regard.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." The Petitioner has failed to explain in what *other* crime, wrong, or act the evidence found in the apartment was admitted to prove conformity with a character trait. Instead, the evidence was admitted as proof of the offense for which the Petitioner was on trial. As such, Rule 404(b) was not applicable. *See State v. Sherman Dewayne Dillard, Jr.*, No. M2018-02268-CCA-R3-CD, 2020 WL 1897167, at *5 (Tenn. Crim. App. Apr. 16, 2020). Therefore, the Petitioner has not established that trial counsel or appellate counsel were deficient for failing to raise Rule 404(b) or that he was prejudiced by the failure to argue Rule 404(b). He is not entitled to relief on this issue.

### (11) Brady

The Petitioner contends that appellate counsel was ineffective by failing to argue in the motion for new trial and on delayed appeal that the State's failure to turn over Officer Falatko's statement to internal affairs prior to trial was a *Brady* violation. The State contends that appellate counsel made a strategic decision not to pursue a *Brady* claim after the trial court ruled the statement was inadmissible. Additionally, the State contends that the Petitioner cannot establish prejudice because the statement was not "material."

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and the "Law of the Land" clause of article I, section 8 of the Tennessee Constitution affords all criminal defendants the right to a fair trial. The United States Supreme Court, in *Brady v. Maryland*, 373 U.S. 83 (1963), held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of good faith or bad faith of the prosecution." Exculpatory evidence includes information or statements of witnesses which are favorable to the accused and evidence in which the defense may use to impeach a witness. *See State v. Walker*, 910 S.W.2d 381, 389 (Tenn. 1995). In order to establish a *Brady* violation, a defendant must show the existence of four elements: (1) that the defendant requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); (2) that the State withheld the information; (3) that the withheld information was favorable; and

(4) that the withheld information was material.  *Id.  E*vidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).

As we stated *supra*, the Petitioner has unsuccessfully pursued many avenues to obtain Officer Falatko's statement to internal affairs for use at trial.  At the post-conviction hearing, the Petitioner submitted as an exhibit a motion he filed for disclosure of *Brady* materials and maintained that trial counsel cited *Jencks* and *Brady* when arguing that the Petitioner should be provided with the statement.  The Petitioner complains, however, that appellate counsel argued that the failure to provide the Petitioner with the statement was a *Jencks* violation and that the statement constituted newly discovered evidence.

The Petitioner notes several "critical" inconsistencies between Officer Falatko's statement and his trial testimony.  However, as the post-conviction court observed, this court has previously determined that "[a]ny discrepancies between Officer Falatko's trial testimony and his prior statement are not so significant that a different result at trial may have occurred had the prior statement been provided to the [Petitioner]at the trial." *Rodney Turner*, 2017 WL 3268543, at \*5.  As such, the post-conviction court concluded "that if the statement had been produced before trial it would not have changed its result."  The post-conviction court found that the Petitioner failed to establish either that appellate counsel was deficient or that the Petitioner suffered any prejudice.  We agree.  The Petitioner is not entitled to relief in this regard.

### *(12) Rule 11 Application*

The Petitioner contends that appellate counsel was ineffective by failing to file a Rule 11 application for permission to appeal to the supreme court.  He argues that because appellate counsel had not withdrawn from representation, she was obligated to file his Rule 11 application; therefore, her performance was deficient.  He further argues that if his Rule 11 application had been prepared by appellate counsel, instead of pro se, "there is a reasonable probability that it would have been granted."  The State responds that appellate counsel did not file a Rule 11 application after discovering that the Petitioner filed a pro se Rule 11 application and that her decision not to amend the application with additional, frivolous issues was not deficient.  The State further argues that the Petitioner did not suffer prejudice because the supreme court considered the Rule 11 application and denied it on the merits.

The post-conviction court found that appellate counsel had intended to file a Rule 11 application but that the Petitioner informed her that he filed a pro se Rule 11 application and that he "indicated he wished to file and handle the Rule 11 himself."  Thereafter,

appellate counsel filed a motion to withdraw as counsel. The Petitioner's Rule 11 application was denied by the supreme court. The post-conviction court concluded that the Petitioner "was not denied a Rule 11 application and he has failed to demonstrate counsel was ineffective."

We note that Tennessee Supreme Court Rule 14 provides:

Permission for leave to withdraw as counsel for an indigent party after an adverse final decision in the Court of Appeals or Court of Criminal Appeals and before preparation and filing of an Application for Permission to Appeal in the Supreme Court must be obtained from the intermediate appellate court by filing a motion with the Appellate Court Clerk not later than fourteen (14) days after the intermediate court's entry of final judgment.

Moreover, ordinarily "a defendant may not proceed pro se while simultaneously represented by counsel." *State v. Smith*, 492 S.W.3d 224, 242 (Tenn. 2016). Accordingly, appellate counsel's failure to file a timely motion to withdraw and to file a Rule 11 application for permission to appeal was arguably deficient performance. Nevertheless, we note that the Petitioner is not entitled to counsel in a Rule 11 application. *See Marvin Christopher Long v. State*, No. M2017-01758-CC-R3-CD, 2018 WL 6288172, at *4 (Tenn. Crim. App. Dec. 13, 2018). Furthermore, the Petitioner's pro se Rule 11 application was considered by the supreme court, and it was denied. Thus, the Petitioner was not denied his opportunity for second-tier appellate review. Therefore, the Petitioner did not establish that he suffered any prejudice. He is not entitled to relief on this issue.

*(13) Cumulative Error*

Finally, the Petitioner contends that the individual errors he alleged in support of post-conviction relief, when examined cumulatively, entitle him to a new trial. The cumulative error doctrine applies only where there has been more than one actual error, which the Petitioner has failed to establish. *See State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). Therefore, he is not entitled to relief.

**CONCLUSION**

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE